UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA ROSS o/b/o
SAMANTHA SPRAKER,

                                              Case No. 2:15-cv-13133
            Plaintiff,                        District Judge Stephen Murphy, III
                                              Magistrate Judge Anthony P. Patti

v.

COMMISSIONER OF
SOCIAL SECURITY,

            Defendant.
_____/

### RECOMMENDATION TO DENY AS MOOT DEFENDANT'S FIRST MOTION FOR SUMMARY JUDGMENT (DE 15), GRANT DEFENDANT'S SECOND/AMENDED MOTION FOR SUMMARY JUDGMENT (DE 16) AND DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 13)

**I.     RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY AS MOOT** Defendant's first motion

for summary judgment (DE 15), **GRANT** Defendant's second/amended motion for

summary judgment (DE 16), **DENY** Plaintiff's motion for summary judgment (DE

13), and **AFFIRM** the Commissioner's decision.

## II.    REPORT

Plaintiff, Tina Ross, on behalf of Samantha Spraker,[1] brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying Spraker's application for social security disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's motion for summary judgment (DE 13), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 16),[2] and the administrative record (DE 9).

### A.    Background

Spraker filed an application for DIB in May 2012, alleging that she has been disabled since June 19, 2010.  (R. at 208-209.)  In June 2012, Spraker applied for SSI, also alleging June 19, 2010 as the disability onset date.  (R. at 218-223.)  In a disability report completed by Plaintiff for Spraker, the conditions listed preventing Spraker from working are: "bipolar, manic, depression, anxiety" and "some

---

[1] Ross is the legal guardian of Spraker, her daughter.

[2] On April 11, 2016, the Commissioner filed a motion for summary judgment (DE 15) but, without explanation, filed another motion for summary judgment the next day.  (DE 16.)  The second motion appears to be substantively the same as the first, except the latter motion contains a table of authorities.  This Report and Recommendation will discuss the second motion and recommends that the first motion be deemed moot, as amended by the second.  However, the Commissioner is reminded that LR 7.1(b)(2) requires leave of Court for a party to file more than one motion for summary judgment.

phycoisis[.][sic]" (R. at 248.)  Spraker's applications were denied (R. at 120-129) and she sought a *de novo* hearing before an Administrative Law Judge ("ALJ"). (R. at 132-133.)  ALJ Ethel Revels held a hearing on February 19, 2014.  (R. at 25-77.)  On May 21, 2014, ALJ Revels issued an opinion which found Spraker to not be disabled.  (R. at 10-18.)  On July 20, 2015, the Appeals Council denied Spraker's request for review.  (R. at 1-3.)  ALJ Revels' decision thus became the Commissioner's final decision.  Plaintiff then timely commenced the instant action on behalf of Spraker.

### B.    Spraker's Medical History

A July 2011 comprehensive psychosocial assessment notes that Spraker was hospitalized in June 2010 for nineteen days due to a "Psychotic Episode with severe hallucinations[.]"  (R. at 406.)  In July 2010, Spraker was prescribed an antidepressant by Howard Wright, D.O.  (R. at 322.)  Spraker has thereafter been prescribed mental health medications, though the precise medications and dosages have varied.  An adult clinical assessment from July 2010 notes that Spraker reported feeling confused and had a diminished memory of recent events.  (R. at 357.)  Spraker also stated then that she began using marijuana at age eighteen and until recently had smoked "1-2 joints most days." (*Id.*)  Treatment notes from July 2011 refer to Spraker having schizophrenia.  (R. at 378.)

Treatment notes from September 2010 (R. at 367), October 2010 (R. at 368), November 2010 (R. at 369) and August 2011 all reflect that Spraker was not suffering from hallucinations.  (R. at 400.)[3]  In fact, notes from March 2011 reflect that Spraker had been free of psychosis for one year.  (R. at 361.)

However, in March 2012 Spraker was hospitalized for four days because she was "delusional, incoherent."  (R. at 428.)  Spraker had stopped taking her prescribed mental health medication, and had overdosed on other prescription medications.  (*Id.*)  Spraker was diagnosed with bipolar disorder and polysubstance abuse.  (*Id.*)  After counseling and medication adjustments, upon discharge Spraker "was stabilized" and showed "significant improvement in her mood and behavior . . . ."  (*Id.*)

In April 2012, Nathan Terey, a clinical psychotherapist, wrote a letter stating that he had been treating Spraker since August 2011. (R. at 480.)  He agreed with the diagnosis of bipolar disorder, and noted that she had a manic episode in which she became delusional approximately every six months.  (*Id.*)  Terey opined that "[e]ven with intensive psychotherapy Ms. Spraker will most likely continue to experience manic episodes."  (*Id.*)

---

[3] The notes are from Advanced Counseling Services, but they are handwritten and the signatures are illegible.  Indeed, many treatment notes in the record from various sources are handwritten and, consequently, are difficult—sometimes impossible—to decipher with assured accuracy.

Spraker was again hospitalized for "bizarre behavior, and delusional thinking" in May 2012.  (R. at 487-490.)  The discharge notes from that hospitalization show that Spraker had improved, and had "[n]ormal judgment," was "[n]on-suicidal . . . [and was] able to focus on tasks, [with a] fair level of impulse control . . . ."  (R. at 490.)

 In June 2013, Spraker was hospitalized after intentionally overdosing on medications.  (R. at 542.)  Spraker was not then suffering from hallucinations.  (*Id.*)  She tested positive for cocaine and marijuana usage.  (R. at 549.)  Spraker was deemed to not be in imminent danger upon discharge.  (R. at 550.)

From May 2013 through November 2013, Spraker was seen numerous times by Luay Haddad, M.D.  (R. at 582-592.)  In his April 24, 2013 notes, Dr. Haddad stated that Spraker's affect was appropriate, she had improvement in her goal directed thoughts process and she had no delusions or paranoid ideations.  (R. at 592.)  Similar positive remarks are found throughout Dr. Haddad's treatment notes.[4]  Nonetheless, in December 2013, Dr. Haddad signed a mental impairment

---

[4] See R. at 591 (May 22, 2013 notes reflecting no delusions or paranoia and decreased irritability and anxiousness); 590 (May 29, 2013 notes reflecting "Patient states have [sic] been doing much better"); 589 (June 19, 2013 notes reflecting Spraker "states that she is doing better"); 588 (July 3, 2013 notes reflecting that Spraker had an appropriate affect and good mood and was suffering no side effects from her medications); 587 (July 17, 2013 notes showing Spraker "is adjusting fairly well" and had no side effects from her medications); 585 (September 5, 2013 notes showing Spraker "is doing well" and had no side effects from her medications); 584 (October 3, 2013 notes remarking that Spraker "is

questionnaire (filled out by someone named Melad Aldaral), which states that Spraker has no useful ability in areas such as being able to function with the general public and having the ability to make simple work-related decisions, and is unable to meet competitive standards in several areas such as maintaining appropriate social behavior.  (R. at 595-596.)  That form also listed several side effects from Spraker's medications, including numbness in fingers and toes and memory loss.  (R. at 594.)

### C.   Hearing Testimony

#### 1.   Spraker's Testimony

At the February 19, 2014 hearing, Spraker testified that she graduated high school in 2007 and then spent about two and one-half years in college.  (R. at 32.)[5] In high school she worked at a daycare and later worked as a cashier/stocker at a farmers' market.  (R. at 31-32.)  Spraker worked at the farmers' market on a part-time basis from 2008 to 2010.  (R. at 68-69.)  The ALJ concluded that only the part-time work at the farmers' market was prior relevant work.  (R. at 70.)

---

doing well" and had no side effects from her medications); 583 (October 31, 2013 notes remarking that Spraker "is stable and doing well" and had no side effects from her medications); 582 (November 27, 2013 notes remarking that Spraker "is stable and doing well" and had no side effects from her medications).

[5] Though Plaintiff was not asked her age at the hearing, her application for DIB lists her birthdate as May 24, 1989.  (R. at 208.)

Spraker dropped out of college after she had what she termed an "episode" (i.e., a hallucination) in June 2010. (R. at 33-34.) Spraker tried to go to school thereafter, but dropped out due to feeling paranoid and anxious. (R. at 43.) However, she told her doctor that she dropped out of a nursing class because she stopped wanting to be a nurse after observing what nurses actually do. (R. at 43-44.) She had not used illegal drugs for about a month prior to the June 2010 episode. (R. at 34.) After the hallucination, Spraker was hospitalized and thereafter "started going to a psychiatrist and got put on medication." (R. at 34.)

Upon her release from the hospital in 2010, Plaintiff became Spraker's guardian, and Plaintiff's status as Spraker's guardian has been renewed annually thereafter. (R. at 36.) Spraker has difficulty making decisions, especially regarding money; she also has trouble cooking and cleaning. (R. at 36-37.) Spraker can use a microwave but not a stove. (R. at 37.) She cleans her bathroom about once a week and sometimes vacuums, but is forgetful and thus needs reminders from Plaintiff. (R. at 38.)

As to her daily activities, Spraker usually gets up about 6 or 7 a.m., drinks coffee, colors and takes a nap or two. (R. at 39.) She also sometimes visits her aunt. (R. at 39.) Spraker does not like to drive but sometimes drives the five miles or so to her aunt's house. (R. at 39.) She has two friends with whom she talks on

the phone or gets together with to watch television.  (R. at 40.)  She also sometimes uses Facebook.  (R. at 40.)

Spraker does not believe she can do full-time work because she becomes paranoid or anxious in public settings.  (R. at 40-41.)  Plaintiff has to repeatedly tell Spraker how to do things, such as laundry.  (R. at 41.)  Spraker last worked regularly in August 2010, but sometimes washes dishes at a restaurant owned by a friend's family.  (R. at 42-43.)

After Plaintiff testified, Spraker was asked additional questions by the ALJ. Spraker has used marijuana, cocaine (twice) and heroin, but only the marijuana usage was on a long-term basis.  (R. at 59-60.)  Spraker takes her prescribed medications, and Plaintiff monitors that intake.  (R. at 63.)

### 2.  Plaintiff's Testimony

Plaintiff's testimony began with the ALJ remarking that she did not have an "updated guardianship document in the file."  (R. at 45.)  Plaintiff's counsel and the ALJ then engaged in an extended colloquy, the end result of which was counsel promised to provide the ALJ with updated guardianship documentation. (R. at 45-47.)

Plaintiff then testified that she became Spraker's guardian in October 2010 and her guardianship had been renewed annually thereafter.  (R. at 47-48.)  The ALJ then interjected that "all you have to do is ask for a renewal and if there are no

objections from anyone then they automatically renew it."  (R. at 48.)  Plaintiff

responded by asserting that Spraker has fought against having a guardian.  (*Id.*)

Shortly thereafter, the ALJ said she "accept[s]" Plaintiff's testimony.  (R. at 49.)

When asked by counsel why Spraker needs a guardian, Plaintiff replied that

Spraker "has very bad panic modes" and sometimes hallucinates.  (R. at 50.)

Spraker also has stated that she can hear Plaintiff's mother and grandfather

speaking, even though both are deceased.  (R. at 50.)  Plaintiff also has to sleep in

Spraker's room two to four times per month because Spraker is afraid of the dark

and fears "somebody is going to come and get her."  (R. at 51.)

    Spraker has lived with Plaintiff since June 2010.  (R. at 51.)  Spraker lies

down to nap two to three times per day, for between forty minutes and three hours

at a time.  (R. at 52.)  Spraker loves music and coloring, but she gets anxious when

going to a store.  (R. at 52-53.)  Overall, Spraker's "socialism [sic] has totally

diminished" to the point where she "can't socialize." (R. at 54.)  With repetitive

prodding, Spraker cleans the bathroom weekly, sometimes feeds the dogs and

vacuums. (R. at 55.)

    After further discussion between counsel and the ALJ, and additional

testimony by Spraker, the ALJ asked Plaintiff how she makes sure Spraker takes

her medications, to which Plaintiff replied that she places the medications in

Spraker's hands, watches her take the medicine then makes her open her mouth to

make sure she hasn't secreted the medication.  (R. at 63-64.)  For a few months Plaintiff trusted Spraker to take the medicines independently, but that led to Spraker trying to harm herself.  (R. at 64.)

### 3.  Vocational Expert's Testimony

Vocational Expert ("VE") Donald Harrison classified Spraker's prior work as a cashier as light and semi-skilled and her prior work as a stocker as medium and unskilled.  (R. at 71-72.)  The ALJ then asked the VE if a hypothetical person with Spraker's age, educational level and experience and who "needs work that is simple/routine . . . [is] not . . . with the general public, [has] no more than casual interaction with co-workers . . . [and is] not . . . performed at a production pace" could perform Spraker's prior relevant work.  (R. at 72-73.)  The VE answered that such a hypothetical person could perform Spraker's past work as stocker, but not her prior work as a cashier. (R. at 72.)  The VE testified that such a person could work at all exertional levels, and he listed several jobs which the hypothetical person could perform, including, among others, laundry checker (medium with 2,000 jobs regionally and 100,000 nationally), hand packer (medium with 2,500 jobs regionally and 125,000 nationally), small products assembler (light with 1,800 jobs regionally and 85,000 nationally), office cleaner (light with 2,500 jobs regionally and 250,000 nationally), and institutional cleaner (heavy with 1,500 jobs regionally and 85,000 nationally).  (R. at 73-75.)  When asked by Spraker's

counsel, the VE stated that an employee was generally allowed one to one and one-half absences per month, so four absences monthly would be work preclusive.  (R. at 76.)  Finally, the VE agreed that being off task twenty percent or more of a work day would impede an individual's "ability to competitively work."  (R. at 76.)

### D.  The Administrative Decision

In her May 21, 2014 decision, the ALJ first concluded that Spraker met the insured status requirements through June 30, 2012.  (R. at 12.)  At Step 1 of the sequential evaluation process,[6] the ALJ found that Spraker had not engaged in substantial gainful activity since her alleged onset date of June 19, 2010.  (R. at 12.)

---

[6] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At Step 2, the ALJ found that Spraker had the following severe impairments: "a bipolar disorder, schizophrenia, a personality disorder, and polysubstance abuse . . . ." (R. at 13.)  At Step 3, the ALJ found that Spraker did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13.)

Prior to undertaking Step 4 of the sequential process, the ALJ evaluated Spraker's residual functional capacity ("RFC")[7] and determined that she had the capacity to perform "a limited range of work at all exertional levels[,]" with the following nonexertional limitations:  limited to "simple, routine tasks[,]" no working with the general public, only "casual interaction" with coworkers, no working at a production pace, and no working as a team member or in "tandem task activities." (R. 14-15.)  At Step 4, the ALJ concluded that Spraker could not perform her past relevant work as a cashier. (R. at 17.)

At Step 5, the ALJ concluded that Spraker was capable of performing other jobs that exist in significant numbers in the national economy. (R. at 17-18.) Specifically, the ALJ gave "great weight" to the VE's testimony that an individual

---

[7] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

with Spraker's age, education, work experience and RFC could work as, *inter alia*, a laundry checker, office cleaner and institutional cleaner. (R. at 18.) The ALJ therefore concluded that Spraker was not disabled under the Social Security Act. (R. at 18.)

### E.  Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F. ANALYSIS

### 1. Plaintiff's Failure to Comply with LR 7.1 and My Practice Guidelines

Local Rule 7.1(d)(2) mandates in relevant part that "[a] brief supporting a motion or response must, at the beginning, contain a concise statement of the issues presented . . . ."  Similarly, my Practice Guidelines for Social Security cases stress the need for that separate issues presented page.[8]  Nevertheless, Plaintiff's motion for summary judgment does not contain a separate issues presented page early in the motion.  Instead, page eleven of her motion for summary judgment contains one paragraph tersely listing the "issues for review[.]"  (DE 13 at 11) (capitalization standardized and emphasis omitted).   However, as will be noted later herein, in addition to not complying with LR 7.1 or my Practice Guidelines,

---

[8] Specifically, my Practice Guidelines contain the following directions for Social Security motions:

> All motions and briefs must comply with Local Rule 7.1. The parties are particularly reminded of the requirement that all briefs must include an "Issues Presented" page. On that page, the parties shall outline the issues to be presented in their briefing. In the case of a motion for summary judgment or remand, the "Issues Presented" must indicate the error allegedly committed by the Administrative Law Judge, i.e., the bases for the appeal and grounds for reversal. Within the parties' briefs, the issues presented should be labeled as section headings, and should match the items listed on the "Issues Presented" page. Any issue addressed in the brief that is not both 1) included in Issues Presented and 2) labeled as a section heading within the brief, will not be considered by the Court.

that issues presented paragraph does not precisely align with the issues discussed substantively later in the motion.

In order to not penalize Plaintiff and Spraker for counsel's nonconforming motion, I will leniently examine the issues presented on their merits, though not without some frustration.  Counsel is cautioned, however, that any future failure to comply with the Local Rules and/or my Practice Guidelines may result in sanctions, including the striking of a motion or other pleading.

## 2.  Issues

Plaintiff lists six issues in the issues presented paragraph.  First, she contends the ALJ "erred in questioning the validity of the guardianship and disregarding the testimony of said guardian[.]"  (DE 13 at 11.)  Second, she broadly asserts the ALJ "had a duty to develop the record[.]"  (*Id.*)  Third, she awkwardly alleges the ALJ "erred in providing a valid explanation [sic] for her rejection of the opinion and assessment of Plaintiff's treating physician[.]"  (*Id.*)  Fourth, Plaintiff contends the ALJ "made an improper credibility assessment[.]"  (*Id.*)  Fifth, she argues that the ALJ "erred in finding past relevant work[.]"  (*Id.*)  Finally, Plaintiff contends the ALJ "erred in not considering the effect of Plaintiff's impairment on her ability to work[.]"  (*Id.*)  Each issue presented in the body of the motion, regardless of whether it is aligned precisely with the issues presented paragraph, will be addressed in turn.

### 3. Guardian's Testimony

Plaintiff states, correctly, that the ALJ's decision did not mention her status as Spraker's guardian, which Plaintiff alleges shows bias on the part of the ALJ. (DE 13 at 12-13.)  Extrapolating from that, Plaintiff contends the ALJ's failure to analyze her testimony about her guardianship is an improper failure to consider lay evidence.

Better practice would likely have been for the ALJ to have specifically referred to Plaintiff as Spraker's guardian.  But the omission of the term "guardian" is not sufficient in and of itself to mandate relief, as Plaintiff must show prejudice therefrom.  As the Commissioner asserts, Plaintiff has not made that showing.

The ALJ obviously was aware of Plaintiff's testimony, which included ample references to her status as Spraker's guardian.  After all, the ALJ presided over the hearing at which the testimony was given.  In addition, the ALJ's opinion does not completely ignore Plaintiff's testimony.  To the contrary, after discussing certain evidence in the record, the ALJ wrote that other evidence "suggest[s] that the claimant [Spraker] is less symptomatic than what was alleged at the hearing. The inconsistencies do not help the claimant's *and her mother's* credibility."  (R. at 15) (emphasis added).

In addition, Plaintiff's testimony focused primarily on Spraker's forgetfulness and need for some supervision.  However, Plaintiff also testified that Spraker visits with family and friends, colors and performs some degree of routine household tasks (albeit with prompting).  In other words, Plaintiff has not shown that her testimony proves that Spraker has greater limitations than those found by the ALJ.  Therefore, the ALJ's failure to discuss specifically and at length Plaintiff's testimony, including specifically noting her guardianship status is, at most, a harmless error.  *Allison v. Comm'r of Soc. Sec.*, 108 F.3d 1376 (Table), 1997 WL 103369, at *3 (6th Cir. 1997) ("Although lay testimony must be given perceptible weight where it is supported by medical evidence, we are not convinced that the ALJ ignored the younger Allison's testimony. . . . The ALJ found that Mr. Allison did have severe physical and mental impairments-and this was the only part of the five-step sequential evaluation to which the testimony of Mr. Allison, Jr., was directly relevant. The ALJ rejected Mr. Allison's claim on the basis of a perceived ability to perform a significant number of jobs in the national economy-an issue on which the younger Allison was not qualified to speak and which he did not address. It is irrelevant that the ALJ did not discuss the younger Allison's testimony; neither precedent nor common sense requires written discussion of every single piece of evidence.") (quotation marks and citation omitted).

Moreover, the fact that Plaintiff was deemed in need of a guardian under Michigan law does not—contrary to Plaintiff's argument—mean that she is entitled to social security benefits.  Tellingly, Plaintiff does not cite to a case to support her position, nor does the record contain transcripts or detailed opinions from the Michigan Probate Court to explain the basis for the guardianship.

The question in a social security action is whether a claimant is capable of performing substantial gainful activity, which is not the question at issue in guardianship actions under Michigan law.  Thus, a determination that Spraker needs a guardian under Michigan law is not dispositive of, and arguably not even relevant to, the issue of whether Spraker can perform substantial gainful activity. In short, a Michigan court's decision to appoint Plaintiff as Spraker's guardian does not bind the Commissioner to award Spraker social security benefits.  *Cf., e.g., Lohmeier v. Colvin*, 2016 WL 825850, at *7 (D. Ariz. March 3, 2016) ("Disability determinations by other governmental and non-governmental agencies are not binding on the Commissioner. This rule applies even where the standards for obtaining disability benefits through another agency are more rigorous than the standards applied by the Social Security Administration.") (citations omitted).[9]

_____

[9] The Court is cognizant that the style of this case refers to Spraker as being "legally incapacitated." However, that legal conclusion was provided by Plaintiff herself in her Complaint.  (DE 1 at 1.)  The Court need not analyze whether Spraker is, in fact, "legally incapacitated."  Instead, the issue before the Court is whether the Commissioner's final decision should be reversed or remanded via

Finally, the Court should reject Plaintiff's unsupported argument that the ALJ was biased.  "Although due process requires an impartial decision-maker in judicial and quasi-judicial proceedings, the court must start from the presumption that administrative adjudicators are unbiased, and that honesty and integrity exist among them.  But the burden of establishing a disqualifying interest rests on the party making the assertion. Alleged prejudice must be evident from the record and cannot be based on speculation or inference."  *Wells v. Apfel*, 234 F.3d 1271 (Table), 2000 WL 1562845 (6th Cir. 2000) (quotation marks and citations omitted).  Plaintiff has not met that burden.  Simply put, Plaintiff's allegations of bias are supported only by her speculation and inferences.

Though Plaintiff asserts as evidence of bias the ALJ having engaged in a colloquy with counsel about Plaintiff's current guardianship status "in almost a badging [sic] way", it was proper for the ALJ to do so. (DE 13 at 9.)  Plaintiff's reason for testifying at the hearing was premised upon her being Spraker's guardian, and that guardian status could only be confirmed by a current guardianship order.  However, some of the guardianship paperwork which had been submitted by Spraker's counsel was out of date.  *See, e.g.,* R. at 207 (guardianship order which expired on 10/11/2012); R. at 225 (guardianship order

---

application of the aforementioned standards of review.  In other words, merely self-referencing Spraker as being "legally incapacitated" is not germane to the limited issue of whether Spraker is entitled to relief from the Commissioner's final decision.

which expired on 10/11/2013).  Notably, the ALJ did not deny that Plaintiff was, in fact, Spraker's guardian,[10] nor did the ALJ limit the evidence Plaintiff's counsel presented.  At most, the ALJ appeared frustrated with counsel's failure to provide updated guardianship paperwork beforehand, but nothing from the face of the record supports Plaintiff's claim that the ALJ was biased.[11]

### 4.  Developing the Record

Somewhat relatedly, Plaintiff next argues that the ALJ failed to comply with her duty to develop the record.  (DE 13 at 15-16.)  Though the argument is not a model of clarity, as the Court construes it Plaintiff argues that the ALJ should have developed the record further regarding her status as Spraker's guardian.  However, Plaintiff's claim fails--regardless of what unspecified additional development of the record she believes the ALJ had a duty to undertake.

The Sixth Circuit has clearly held that, because a claimant bears the burden to show an entitlement to benefits, "[o]nly under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is

---

[10] To the contrary, the ALJ stated that she "accept[ed]" Plaintiff's testimony about the state guardianship proceedings.  (R. at 49.)

[11] Based on my review of the hearing transcript, the Undersigned simply cannot agree with Plaintiff's contention that the ALJ had a "dismissive attitude" regarding the guardianship, as purportedly evidenced by the ALJ "purposely not entering evidence of the guardianship" and "harassing the guardian as to the need to testify . . . ."  (DE 17 at 1.)   Instead, an ALJ, upon seeing outdated guardianship orders in a file, simply tried to ensure Plaintiff was Spraker's current guardian before permitting Plaintiff to testify.

unfamiliar with hearing procedures, does an ALJ have a special, heightened duty to develop the record." *Trandafir v. Comm'r of Soc. Sec.*, 58 Fed. App'x 113, 115 (6th Cir. 2003). Spraker was represented by counsel at the hearing, was permitted to present whatever testimony counsel desired, and there are otherwise no "special circumstances" which placed a duty to develop the record further upon the ALJ.

Moreover, the Court agrees with the Commissioner that Plaintiff "has not proposed what additional information could have been garnered by additional development, and certainly has not demonstrated that she was prejudiced by the ALJ's failure to obtain such unidentified 'information.'" (DE 16 at 15.) In short, Plaintiff's argument should be rejected.

### 5. Treating Psychiatrist

Plaintiff next contends the ALJ failed to provide a proper basis for rejecting the opinions of Dr. Haddad, Spraker's treating psychiatrist. The Commissioner does not take issue with Dr. Haddad's status as a treating source; instead the Commissioner argues in response that "the ALJ properly considered the treating opinion evidence and reasonably declined to accord it controlling weight." (DE 16 at 19.) I agree with the Commissioner.

Several sections of the ALJ's opinion contain an extended summary of the treatment notes of various providers, including Dr. Haddad. (R. at 13-16.) The

ALJ then states that limitations contained in the December 2013 mental health

questionnaire signed by Dr. Haddad:

> seem markedly inconsistent with Dr. Haddad's own treatment notes
> and seem quite inconsistent with the preponderance of the other
> documentary evidence in this case. The undersigned finds that the
> conclusions in [that questionnaire] are grossly inconsistent with the
> record. The undersigned does not give much weight to the opinion[s]
> in [the questionnaire].

 (R. at 16.)

### i.  Treating Source Standards of Review

The ALJ generally gives deference to the opinions of a treating source

"since these are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring

a unique perspective to the medical evidence that cannot be obtained from the

objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581

F.3d at 408. To qualify as a treating source, the physician must have an "ongoing

treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's

opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r

of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not

give a treating source's opinion controlling weight:

> an ALJ must apply certain factors—namely, the length of the
> treatment relationship and the frequency of examination, the nature
> and extent of the treatment relationship, supportability of the opinion,

> consistency of the opinion with the record as a whole, and the
> specialization of the treating source—in determining what weight to
> give the opinion.

*Id.*  Furthermore, an ALJ must "always give good reasons in [the] notice of

determination or decision for the weight [the ALJ] give[s] your treating source's

opinion." 20 C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be

sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that

weight."  *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 550 (6th Cir. 2010)

(internal quotation omitted).

The United States Court of Appeals for the Sixth Circuit has stressed the

importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants
> understand the disposition of their cases," particularly in situations
> where a claimant knows that his physician has deemed him disabled
> and therefore "might be especially bewildered when told by an
> administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d
> Cir.1999). The requirement also ensures that the ALJ applies the
> treating physician rule and permits meaningful review of the ALJ's
> application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33
> (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45.  Thus, the reason-giving requirement is "particularly

important when the treating physician has diagnosed the claimant as disabled."
*Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir.
2008) (citing *Rogers*, 486 F.3d at 242).[12]

### ii. ALJ's Rejection of Dr. Haddad's Opinions

Much of Plaintiff's argument focuses on the ALJ's discussion of Dr.
Haddad's treatment notes during her Step 3 analysis regarding whether Spraker
meets a listed impairment. (R. at 13-14.) However, Spraker has not claimed that
she does, in fact, meet a listed impairment, which means that the ALJ's discussion
of Dr. Haddad's opinions in that context is of questionable significance.
Regardless, Plaintiff is not entitled to relief.

First, Plaintiff criticizes the ALJ for referring only to exhibits in the record
without a pinpoint citation to specific pages in those exhibits. Ideally, the ALJ
would have provided pinpoint cites, but her failure to do so <u>is an inconvenience</u>,
not grounds for relief. Moreover, contrary to Plaintiff's argument, the ALJ did not
erroneously state that Exhibit 14F in the record was written by Dr. Haddad; instead
the ALJ merely commented that Exhibit 14F "states that the claimant's memory is
only slightly impaired" without specifying an author. (R. at 14.) In fact, Exhibit
14F, which consists of some notes from Mr. Terey (the clinical psychotherapist),

---

[12] Plaintiff's brief improperly asserts that the ALJ had to provide "clear and
convincing" reasons for rejecting Dr. Haddad's opinions. (DE 13 at 16.)

does—as the ALJ accurately noted--contain a section where boxes are checked indicating that Spraker's short-term and long-term memory are only slightly impaired. (R. at 524.)

Second, the ALJ was accurate when she held that Dr. Haddad's conclusions in the questionnaire (that Spraker was suffering side effects from her medications and had, basically, a vastly diminished ability to function) are in contrast to, among other things, *his own treatment notes*. To be sure, there are notations in Dr. Haddad's notes reflecting a less rosy outlook for Spraker. *See, e.g*., R. at 588 (Spraker had been hospitalized after attempting suicide and was continuing to smoke marijuana). However, Dr. Haddad's notes are *replete* with references to Spraker's improving, stable condition and lack of delusions or side effects.[13] Moreover, the dire conclusions expressed by Dr. Haddad in the questionnaire are contrasted by other matters in the record. Specifically, as the ALJ noted, Spraker is able to visit with family and friends, perform some household chores and do puzzles (which will be discussed later in this Report and Recommendation).

---

[13] *See, e.g.,* R. at 592 (Spraker had no delusions); R. at 589 (Spraker's "[t]hough [sic] process was clear and organized"); R. at 583 (Spraker "is stable and doing well.") R. at 591 (Spraker had no delusions or paranoia and decreased irritability and anxiousness); 590 ("Patient states have [sic] been doing much better"); 588 (Spraker had an appropriate affect and good mood and was suffering no side effects from her medications); 587 (Spraker "is adjusting fairly well" and had no side effects from her medications); 585 (Spraker "is doing well" and had no side effects from her medications); 584 (Spraker "is doing well" and had no side effects from her medications); 582 (Spraker "is stable and doing well" and had no side effects from her medications).

Similarly, as the ALJ noted, Mr. Terey checked boxes on a form indicating that Plaintiff has no delusions, no hallucinations, only a slightly impaired memory, no suicidal ideation and only a moderately affected attention span.  (R. at 524.)

Plaintiff obviously disagrees with the ALJ's rejection of the conclusions in the questionnaire signed by Dr. Haddad.  However, the ALJ's function—not this Court's—is to determine which evidence should be assigned great weight and which should be rejected.  The ALJ reviewed the record and determined that Dr. Haddad's conclusions, as expressed in the questionnaire, did not comport with either his own treatment notes or the record as a whole.  The ALJ's decision is supported by evidence in the record and her rationale has been explained sufficiently to this subsequent reviewer.  Consequently, the ALJ's decision should not be disturbed.

### 6.  Credibility Determination

Without citing any cases to buttress her scattershot argument, Plaintiff contends the ALJ erred in assessing Spraker's credibility.  Specifically, Plaintiff argues the ALJ erred by: remarking on Spraker's ability to do puzzles; remarking on Spraker using Facebook and having had a boyfriend; and stating that Spraker's hospitalizations were not of extended duration.  (DE 13 at 18-19.)

### i.  Credibility Standards of Review

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue,* 263 Fed. App'x 469, 475 (6th Cir. 2008); *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly."). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. It is for this reason that the ALJ's credibility findings have at times been characterized as "unchallengeable."  *Payne v. Comm'r Soc. Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010); *see, Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("A circuit court . . . may not review a determination of credibility. It is for the Secretary and his examiner, as the factfinders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony.") (quotation marks, citation and alteration omitted). Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other

evidence." *Id*.; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."). The ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight." *Malcolm v. Comm'r of Soc. Sec.*, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (Parker, J.).

### ii. Puzzles

The ALJ noted that Spraker's activities of daily living were only mildly impaired because, *inter alia*, she worked on puzzles. (R. at 13.)[14] Subsequently, when assessing Spraker's RFC, the ALJ stated that "[h]er ability to work puzzles, in particular, suggests good concentration." (R. at 16.) Plaintiff asserts the record shows that Spraker did puzzles in a psychiatric support group, and the notes therefrom show she lacked focus and concentration.

However, the citation to the record given by Plaintiff does not refer to a psychiatric support group; instead that citation is to a function report regarding

---

[14] That discussion was part of the ALJ's Step 3 analysis regarding whether Spraker meets a listing. Since Spraker does not contend that she meets any specific listing, the ALJ's discussion thereof is of questionable importance.

Spraker completed by Plaintiff.  (R. at 264.)  Specifically, the report asked Plaintiff to describe how much time she spends with Spraker and what they do together; included among Plaintiff's answers was a notation that they did "puzzles, movies[.]"  (R. at 264.)  Later, that same form asked Plaintiff to list the things Spraker does with others, and among the things Plaintiff wrote was "puzzel [sic]."  (R. at 268.)  In short, the record does reflect that Spraker works on puzzles, but does not show that she does so only in a therapy group.  It also is common knowledge that it takes concentration to complete successfully a puzzle.  *See, e.g., Howard v. Colvin*, 2015 WL 137525, at *7 (E.D. Tenn. Jan. 6, 2015 ("The ALJ reasonably considered that Plaintiff's completion of puzzle books on a nightly basis was inconsistent with a marked limitation in concentration. Her statement that she completed them 'slowly' does not undermine that finding, particularly as 'slowly' refers to her pace, and not her concentration.").  Moreover, the ALJ gave additional valid reasons not pertaining to puzzles to support her findings regarding Spraker's RFC and failure to satisfy a listing.  In short, nothing regarding the ALJ's mention of puzzles entitles Spraker to relief.

### iii.  Facebook and a Boyfriend

In her discussion of why Spraker does not meet a listed impairment, the ALJ concluded that Spraker's ability to socialize is only moderately impaired because,

*inter alia*, she uses Facebook and had a boyfriend. (R. at 13-14.)[15]  Plaintiff

correctly notes that the exhibits specifically cited by the ALJ do not actually

mention Spraker using Facebook.  (R. at 264-271, 501-510.)  However, Spraker

did testify at the hearing that she sometimes uses Facebook.  (R. at 40.)  Thus, the

fact that the ALJ erroneously cited to exhibits in the record instead of to Spraker's

hearing testimony to support the conclusion that Spraker uses Facebook is, thus, a

manifestly harmless error.  Moreover, Plaintiff using Facebook was only one

component of the ALJ's conclusions regarding Spraker's activities of daily living.

       As to Spraker's former boyfriend, Plaintiff points out that he was abusive

and had Plaintiff try heroin and, thus, his former presence in Spraker's life should

have been used to show her poor ability to make decisions.  At the risk of being

repetitive, the Court must again point out that the ALJ's reference to Spraker

having had a boyfriend was a part, and only a part, of the discussion of why

Spraker does not meet a listing—an issue not before the Court.  (R. at 14.)  The

Court agrees with the Commissioner that the fact that Spraker's former boyfriend

was abusive and encouraged her drug usage is "awful . . . ."  (DE 16 at 20.)

Nonetheless, the ALJ's main point—that Spraker was able to socialize sufficiently

to acquire a boyfriend—is valid.  Moreover, standing alone, the fact that Plaintiff

had an abusive boyfriend who got her to try drugs—a far too common and

---

[15] Again, since Spraker has not, and does not, contend that she satisfies any
particular listing, the ALJ's discussion thereof is of questionable importance.

unfortunate situation in our country—is of only extremely limited value in showing that she *is disabled*, even if, like many people, she exercises poor judgment.  In short, the ALJ was entitled to reach a different inference from this substantive evidence than Plaintiff would have reached, and Spraker is not entitled to relief on the basis of this issue.

### iv.  Hospitalizations

Finally, Plaintiff argues that the ALJ misapplied the law by making a "ridiculous" statement that Spraker's hospitalizations were not of extended duration.  (DE 13 at 19.)  Plaintiff awkwardly, but boldly, asserts that "[n]owhere in the law does it state that in order for there to be a psychiatric episode of decompensation [it?] has to last two weeks."  (*Id.*)

As with Plaintiff's other credibility arguments, the ALJ's discussion of the length of Spraker's hospitalizations was part of a determination of whether Spraker meets a listing.  Which means that, as before, the ALJ's discussion of whether Spraker's hospitalizations were long enough to count as periods of decompensation is of questionable importance.

Nonetheless, Plaintiff is mistaken in her assertion that the ALJ acted in a "ridiculous" manner by focusing on whether Spraker was hospitalized for two weeks or more.  Effective January 17, 2017, the relevant mental health listings and the criteria therefore were substantially changed, and the focus on "episodes of

decompensation" was removed.  *See* 81 FR 66138 (S.S.A.), 81 FR 66138-01, 2016

WL 5507752.  However, the regulations in effect when the ALJ issued her decision

still govern Spraker's claims for benefits.  *Id.* ("We expect that Federal courts will

review our final decisions using the rules that were in effect at the time we issued

the decisions.").[16]

Under the version of 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C)(4) in

effect at the time of the ALJ's decision, among the criteria used to determine if a

claimant satisfied a mental health listing was whether the claimant had experienced

episodes of decompensation of an extended duration, which was defined as two

weeks or more.  *See, e.g., Rabbers*, 582 F.3d at 659 ("Episodes of decompensation

'are exacerbations or temporary increases in symptoms or signs accompanied by a

loss of adaptive functioning, as manifested by difficulties in performing activities

of daily living, maintaining social relationships, or maintaining concentration,

persistence, or pace.' 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4). They 'may

be demonstrated by an exacerbation in symptoms or signs that would ordinarily

require increased treatment or a less stressful situation (or a combination of the

two).' *Id.* 'The term *repeated episodes of decompensation, each of extended*

*duration* ... means three episodes within 1 year, or an average of once every 4

---

[16] In fact, the former rules and regulations were in effect when Plaintiff and the
Commissioner filed their respective motions for summary judgment, which renders
Plaintiff's argument curious.

months, *each lasting for at least 2 weeks*.' *Id.*") (emphasis added). The ALJ thus

acted entirely properly under then-existing law by focusing on whether Spraker's

hospitalizations lasted for two weeks or more. In sum, Plaintiff has not

demonstrated reversible error in any of her claims pertaining to the ALJ's

credibility determinations.

### 7. Past Relevant Work

Plaintiff next argues that the ALJ erred by finding that Spraker had

performed past relevant work because, according to Plaintiff, Spraker's "earnings

[did] not rise to the level of substantial gainful activity." (DE 13 at 19.) Plaintiff

recognized that the determination of whether Spraker performed substantial gainful

activity could be a harmless error but "is arguing this point in conjunction with the

aforementioned arguments to show the repeated sloppiness and lack of care in how

the file was reviewed for a decision." (DE 13 at 20.)[17] In her response, the

Commissioner does not address the substantive correctness of the ALJ's

_____

[17] Ironically, given Plaintiff's counsel chastisement of the ALJ for alleged
sloppiness, Plaintiff's argument contains the following sentence fragment: "Thus,
when computing the math for whether Plaintiff performed SGA [substantial
gainful activity],[.]" (DE 13 at 20.) Moreover, the body of Plaintiff's motion has
two separate issues which are each designated with the Roman numeral II (DE 13
at 15, 16), skips from an issue denominated as issue III directly to an issue
denominated as issue VI (DE 13 at 18, 19), which is immediately followed by an
issue listed as being issue V, which is then followed by yet another Issue VI. (DE
at 20-21.) The brief was obviously not carefully proof-read and falls far below the
quality and orderliness expected by this Court.

conclusion that Spraker had performed substantial gainful activity; instead, the Commissioner merely asserts any such error is harmless in light of the ALJ's conclusion that Spraker could perform other jobs. (DE 16 at 21-22.)

Although the precise phrasing is peculiar, in her reply brief Plaintiff seems to concede that any error in the ALJ's conclusion about Spraker having performed substantial gainful activity in the past is harmless. (DE 17 at 5) ("Albeit the ALJ's finding that Plaintiff had multiple jobs that were past relevant work, when in reality she had no such jobs, is harmless error, it does show the lack of care in representing the true facts in the ALJ's entire decision.").[18] The Court should similarly conclude that the ALJ's conclusion that Spraker performed past relevant work is, at most, harmless error. Moreover, to the extent it is intended as a separate argument, the Court should reject Plaintiff's speculative conjecture that Sparker is somehow entitled to relief due to some vague sloppiness or lack of care by the ALJ (neither of which is apparent in any significant degree from the Court's review of the record).

---

[18] Plaintiff boldly asserts in her reply brief that Spraker "has never been able to work." (DE 17 at 5.) That assertion contradicts the record, including both Plaintiff's own testimony that she worked part-time at a farmers' market from 2008 to 2010 (R. at 68-69) and earnings statements showing Spraker had income of over $9,000 in 2009 and over $5,000 in 2010. (R. at 212-213.) Assertions of fact which flatly contradict the record do not enhance the persuasiveness of the argument they are meant to support and do a disservice to the claimant.

## 8.   Hypothetical to the VE and Ability to Perform Other Work[19]

In her RFC determination, the ALJ concluded that Spraker was limited to "simple[,] routine" tasks because of "occasional limitations" in her ability to maintain concentration "for extended periods . . . ."  (R. at 14.)  Plaintiff contends the usage of the word "occasional" was prejudicial error because the ALJ "never defined what 'occasional' meant in the decision."  (DE 13 at 20.)[20]  The Commissioner does not directly respond to this argument.  Nonetheless, Plaintiff cites to no authority requiring the ALJ to define every term used in either a written decision or a hypothetical.  In any event, the failure to expressly define the word "occasional," standing alone, is insufficient to merit relief as that omission has no direct, tangible bearing on Spraker's right to benefits—especially since Spraker's counsel failed to object contemporaneously at the hearing.  Moreover, "occasional" is hardly an ambiguous term, particularly in the social security context, where it is frequently used in the RFC, e.g. "occasional stooping, bending, lifting."[21]

---

[19] The Court has combined two related sections of Plaintiff's motion.

[20] Immediately after the quoted language, Plaintiff confusingly cites to R. at 73, which is a portion of the hearing transcript in which the ALJ was asking a hypothetical to the VE.  Presumably, therefore, Plaintiff intended to argue that the ALJ should have defined "occasional" in her question to the VE, not in her decision.

[21] Though not discussed by the parties, the Court notes that the word "occasional" is not entirely undefined by the Social Security Administration.  Specifically, in the context of defining what constitutes sedentary work, SSR 83-10 defines

Plaintiff then contends the hypothetical asked by the ALJ to the VE "failed to address [Spraker's] problems with very poor social skills, lack of concentration and episodes of decompensation." (DE 13 at 21.) As the Court construes it, Plaintiff is essentially arguing that the conclusions found in Dr. Haddad's questionnaire should have been included in the hypothetical asked to the VE.

A hypothetical to a VE "must take into account the claimant's functional limitations, i.e., what he or she can and cannot do" but "need not incorporate a listing of the claimant's medical conditions . . . ." *Infantado*, 263 Fed. App'x at 476. In other words, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals . . . ." *Stanley v. Sec'y of Health and Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994).

The hypothetical asked of the VE is in alignment with the ALJ's RFC determination (routine tasks, not working with the general public, no production pace requirements, etc.). Crucially, there was no contemporaneous objection to the hypothetical. (R. at 72-73.) Moreover, both the RFC and the hypothetical did include a notation that Spraker has some degree of diminished concentration. In short, the hypothetical question was not improper and the VE's response to it provided substantial evidence upon which the ALJ could base her decision.

---

"occasional" as "occurring from very little up to one-third of the time." 1983 WL 31251, at *5 (Jan. 1, 1983).

Finally, and relatedly, Plaintiff alleges that the ALJ "failed to sustain her burden of establishing that there is other work in the national economy that [Spraker] can perform." (DE 13 at 21.) Specifically, Plaintiff contends the VE's testimony was not a substantial basis for the ALJ to conclude that Spraker could perform other jobs because the hypothetical to the VE was itself fatally flawed as it did not include the limitations assessed by Dr. Haddad. After all, if the ALJ accepted Dr. Haddad's conclusions as listed in the questionnaire, she would necessarily have had to conclude that Spraker could not perform substantial gainful activity.

However, as discussed previously, the ALJ did not err by rejecting the opinions Dr. Haddad expressed in the questionnaire. Thus, the ALJ was not required to incorporate Dr. Haddad's opinions and findings into the hypothetical to the VE. *Payne*, 402 Fed. App'x at 118 ("First, as already explained, the ALJ properly rejected the opinion of the [sic] Dr. Tan. Therefore, the ALJ was not required to include in her hypothetical any limitations indicated by Dr. Tan.").

### G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports ALJ Revels' decision denying benefits to Spraker. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's

motion for summary judgment (DE 13), **DENY AS MOOT** Defendant's first

motion for summary judgment (DE 15), **GRANT** Defendant's second/amended

motion for summary judgment (DE 16), and **AFFIRM** the Commissioner of Social

Security's decision.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: February 2, 2017              s/Anthony P. Patti
                                     Anthony P. Patti
                                     UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record
on February 2, 2017, electronically and/or by U.S. Mail.


                                     s/Michael Williams
                                     Case Manager for the
                                     Honorable Anthony P. Patti